**ALBERS MILLING COMPANY,**
**Plaintiff-Appellant,**

**v.**

**Marvin CARNEY and Opal Carney,**
**Defendants-Respondents.**

**No. 8167.**

Springfield Court of Appeals.

Missouri.

Oct. 9, 1963.

Robert L. Stemmons, Mt. Vernon, Thomas A. Johnson, Johnson, Johnson & Landis, Neosho, Robert E. Seiler, Dean S. Johnston, Joplin; Seiler, Blanchard & VanFleet, Joplin, of counsel, for plaintiff-appellant.

Edward V. Sweeney, Monett, for defendants-respondents.

HOGAN, Judge.

The plaintiff, a manufacturer of commercial animal feeds, brought this action to recover the balance due upon a contract made between the parties in 1956, in which the plaintiff agreed to furnish capital and feed for a turkey-raising venture undertaken by the defendants. As a set-off and counterclaim, the defendants asserted a breach of implied warranty of fitness in connection with the feed which plaintiff furnished, and a jury has found both for the plaintiff on its claim and the defendants on their counterclaim. The case has been tried twice and comes to us now upon this second appeal by the plaintiff. Details of the agreement between the parties and the prior history of the case are found in the decision upon the former appeal, Albers Milling Co. v. Carney, Mo., 341 S.W.2d 117. Since the factual background of this case was also set out on the former appeal, a brief statement is all that is necessary here.

The defendants began their operation with about 10,500 turkey poults early in April, 1956. The feed was to be furnished, and was furnished, by the plaintiff through a Mr. Henry Moreland, who in this particular year operated as a dealer for the plaintiff. Moreland received the feed from the plaintiff and delivered it in turn to the contract growers. The feeding program was supervised generally by the plaintiff's field salesmen (called "field men") who called periodically upon the contract growers and reported to the plaintiff upon the condition of the particular project. These salesmen, who actually operated as field supervisors for the plaintiff, also prescribed medicine for any animals which became diseased and offered advice generally on the proper management of the flock. Two such field men, first a Mr. Farney and then a Mr. Rohde, assisted the defendants and reported to the plaintiff on their progress.

After the turkeys had begun to grow, within a week to ten days, the defendants, at Mr. Farney's direction, began feeding them a manufactured feed referred to as "pellets" or "growing pellets." This feed, referred to by the plaintiff as a "turkey grower pellet," consisted of small cylinders about ¼ inch long and 53 seconds inch in diameter, manufactured by the plaintiff from ground grains, alfalfa meal, meat meal, soybean meal, and "things of that nature." No deliberate attempt was made to sterilize the feed, but during the manu-

facturing process the temperature of the ingredients was elevated sufficiently to kill ordinary bacteria. This feed was supplied by the plaintiff through its dealer and came to the defendants in 80-pound sealed bags. The plaintiff's officers testified that the feed was packaged by Albers for use as turkey feed and that the company expected the consumer to use it for that purpose.

The defendants' evidence indicated that their turkey flock, which was about 50 per cent hens and 50 per cent toms, progressed very satisfactorily up until late August or early September. The turkeys were then being kept on range (outdoors) by the defendants; defendants' evidence was that the range had never been used for poultry of any kind, and that the range and feeding devices were both clean and dry. The defendants had supplemented the turkeys' feed with grain but, having marketed most of the hens, continued feeding the Albers pellets.

During the latter part of September (Mr. Carney set the date at September 20), the defendants noticed that some of the turkeys appeared to be ill and discovered, about the same time, that the Albers feed was moldy. Upon inspecting the feed, Mr. Carney discovered that "when you would tear open a sack [it] would be moldy; a lot of it would have whiskers on it." Within three or four days, the turkeys were sick, "was drowsy and showed a discharge at the mouth," and "just got down sick." They also developed dysentery and began showing "green droppings." Being assured by the field man, Mr. Rohde, that it was all right to "go ahead and feed" the moldy feed, the defendants did so and followed Rohde's advice in treating the sick turkeys. As a result of this outbreak of disease, the defendants lost about 1800 turkeys and were delayed in marketing the remainder of the flock.

Upon the basis of specialized knowledge acquired since 1956, Mr. Carney was allowed to testify that in his opinion the turkeys had contracted a disease known as mycosis as a result of eating the moldy feed supplied by the plaintiff. He was corroborated in many aspects of his testimony by the evidence of Henry Moreland, the plaintiff's dealer, and by other contract growers whose experience with the plaintiff's feed, during the period involved, had been similar. All had suffered similar losses during the same period; all had noticed the moldy feed and had lost turkeys, presumably as a result of feeding it.

The defendants' evidence was strongly controverted by the plaintiff in rebuttal. It was shown by the plaintiff, principally through its officers and former officers, that there is normally a rather high mortality rate involved in growing turkeys, possibly 10 per cent under normal conditions. In 1956, its evidence indicated, a turkey grower might expect a normal mortality of between 9 to 12 per cent. In fact, it appears uncontradicted that Mr. Carney had been furnished with an excess number of poults, or "overrun," simply to accommodate this expected mortality, and the progress reports kept by the plaintiff's employees indicate that by August 23, defendants had already lost more than 800 turkeys, some of which were apparently killed or died during a storm. Plaintiff's evidence indicated that disease was noted in the defendants' flock long before the date the moldy feed was said to have been received.

The plaintiff also adduced considerable evidence concerning the process by which the feed was manufactured and the system of quality control involved in the manufacturing process. This evidence, if believed by the jury, made it very unlikely that any deleterious substance inadvertently introduced into the manufactured feed would go unnoticed by the plaintiff company. The officers responsible for the maintenance of quality in the plaintiff's feed indicated that at no time during the period involved had they received any complaint about any moldy feed nor, contrary to what the defendants' witnesses had indicated, had any moldy feed been returned

to the manufacturing plant for replacement.

The plaintiff also produced several admittedly well-qualified experts who, in response to hypothetical questions, testified that in their opinion the turkeys in question could not have died as a result of eating moldy feed. The evidence of these experts very positively shows that turkeys suffer, as do other fowl, from a great number of digestive disorders, many of which are extremely difficult to distinguish from others.

Numerous points have been briefed and argued on this appeal by both plaintiff and defendants. In our view, however, the meritorious question, and the point upon which this appeal turns, is whether the jury's verdict is so contradictory and inconsistent as to be self-destructive, as contended by the plaintiff. Specifically, the plaintiff maintains that since the jury found by its verdict that the plaintiff was entitled to recover the full sum of its account, this necessarily precluded a finding for the defendants on their counterclaim. It further asserts that since the finding on the plaintiff's claim stands unappealed from, we should reverse the judgment solely as to the counterclaim. It is frankly conceded by the plaintiff that no objection was made to the consistency of the verdict either at the time it was received or in the motion for new trial, but we are urged to consider the matter as plain error under Rule 79.04, V.A.M.R. It is the defendants' position that since the point was not raised during the trial nor by after-trial motion, we cannot consider it.

In examining this assignment, which is elaborately made and developed here, we must bear in mind the nature of the issues which were actually tried and the theory upon which the case was submitted to the jury. The pleadings on this second trial, although they had been amended in some respects, presented substantially the same issues as before. The plaintiff brought the action to recover a balance due under its

contract; the defendants, by answer and counterclaim, asserted that the plaintiff had breached its warranty of implied fitness by furnishing defective and impure feed. It was pointed out in the earlier opinion that the breach of warranty, if established, would constitute a defense to the plaintiff's action on its claim, to the extent that the account represented the purchase price of feed that had no value, and would also support a claim for any consequential damages suffered by the defendants in their attempt to use the feed for the purpose for which it was warranted to be fit. Albers Milling Co. v. Carney, supra, 341 S.W.2d at 121 [2], [3]. The defendants, by answer and counterclaim, sought both to diminish the sum due plaintiff on its claim and to establish an affirmative claim for consequential damages. The principal contested issue upon this trial was the breach of warranty.

The plaintiff brought this action to recover the sum of $5,024.28; this represents the unpaid balance of defendants' account for the 1956 growing season and represents the amount due and owing together with the accrued interest from November 30, 1956, to July 31, 1957. The defendants admitted that but for the breach of warranty, they would be liable on the account. Their evidence as to the amount they conceded owing is somewhat equivocal; at one point in the record, defendant Marvin Carney admitted that the plaintiff's statement of the account was correct, stating that the sum of $5,024.28 was now due and owing, "except the moldy feed." At another point, during the opening statement, defendants' counsel advised the jury that it was defendants' position that there was no liability on the plaintiff's claim for the medicines furnished after the outbreak of disease, nor for any moldy feed; and he advised the jury that if they found there was consequential damage from use of the moldy feed, they would also be expected to "total up the damage" that defendants had sustained as a result of using the feed. In his closing argument, defendants' counsel

argued that the amount due plaintiff should be diminished in the sum charged for the moldy feed and that no allowance should be made for the feed and medicines furnished after the turkeys became diseased. He also argued that the jury should allow the defendants damages for all the turkeys which died. Specifically, the defendants argued that plaintiff was entitled to $2,470.-13 "at the very most," and that defendants were entitled to recover the sum of $5,740.-47, the value of the turkeys which died. In any event, the defendants contended that there was a net liability to them although, as we have said, their position as to the amount due plaintiff is somewhat equivocal.

Defendant Marvin Carney testified that he had used about 150 bags of the moldy feed, and the record shows that the value of the particular type of feed about which he was speaking was $4.49 per bag. In Mr. Carney's opinion, it was this particular feed which caused the disease and death of his turkeys; and he further testified to the effect that if his flock had not become diseased, he could have marketed his flock some 40 days earlier than he did. Nowhere is it contended by the defendants that the moldy feed could have been put to use for any purpose other than as turkey feed; it was simply their position that they continued to use it because they had had no experience with turkeys and had been assured by the plaintiff's field representative that the moldy feed was not harmful to turkeys. In fact, the defendants undertook to prove that the feed was unfit for use as feed for chickens; their evidence tended to show that a neighbor's chickens had been killed when they were accidentally fed some of the moldy feed.

When the cause was submitted, the jury was instructed by the trial court, at the plaintiff's request, that the defendants could not recover on their counterclaim unless they found that the feed in question was in fact moldy and unfit for use as turkey feed, and that it caused the disease and death of the turkeys. Further, at plaintiff's request,

it was instructed that no allowance be awarded to defendants, either on their set-off or counterclaim, if the jury found that the turkeys became diseased and died from any cause other than the moldy feed. At the defendants' request, the jury was instructed that if they found there had been a breach of warranty and that the turkey flock had become diseased, causing the death of some of the turkeys, then the jury would allow the defendants the reasonable value of the turkeys which died, plus the difference in the reasonable market value of the remaining turkeys before and after they contracted the disease. This instruction, Instruction "A," hypothesized and required a finding that "a portion of said feed was moldy and unfit as feed for growing turkeys." Instruction "B", given at defendants' request, after requiring a factual finding that "a portion of said feed was moldy and was unfit as feed for growing turkeys," advised the jury that they would diminish the account due plaintiff insofar as it represented a charge for moldy feed, and insofar as it represented the purchase price of feed and medicines purchased after the outbreak of disease in defendants' turkey flock. In short, there is no blinking the fact that both the set-off (actually pleaded as a partial failure of consideration) and counterclaim were necessarily predicated upon a finding that at least a part of the feed was moldy and impure.

The record does not reflect what, if any, forms of verdict were prepared for the jury. The trial court's minutes show that after deliberating for more than two and a half hours, the jury returned a unanimous verdict finding the issues for the defendants on their counterclaim and assessing their damages in the sum of $5,024.00. The trial court declined to accept this verdict and the jury again retired, without apparent objection or further instruction. They later returned with a further unanimous verdict, or verdicts, finding for the plaintiff on its claim and for the defendants on their counterclaim. Damages on the claim

and counterclaim were assessed at $5,024.-00, the approximate amount of the plaintiff's account with accrued interest. There is no record of any objection by plaintiff or defendants at this point, nor is there any assignment of error based on inconsistency of the verdict in plaintiff's motion for new trial. The question before us is whether the verdict for the plaintiff in the full amount of its claim required a finding that there was no impure feed and therefore any finding for the defendants on their set-off and counterclaim renders the verdict inconsistent and self-destructive, and whether we should consider this as plain error. There is a further question whether, if we do so, we should reverse the case solely as to the finding on the counterclaim.

■ We see no escape from the conclusion that the verdict, or verdicts, are inherently inconsistent. It is true, generally speaking, that a claim for breach of warranty is not in avoidance of the sale, and an affirmative finding on a counterclaim for breach of warranty is not necessarily inconsistent with recovery of part of the sale price. Albert v. Kopplin Molding Corp., 8 Cir., 247 F.2d 107, 110 [5]; Heuer v. Ulmer, Mo.App., 281 S.W.2d 320, 324 [4, 5]; 46 Am.Jur. Sales, Section 723, p. 847. These general principles do not govern this case, however. Mr. Carney admitted, directly, that in stating the sum due, plaintiff had justly rendered the account. The amount stated was $5,024.28. Of this amount, slightly more than $198.00 was interest which had accrued on Mr. Carney's unpaid balance from November 30, 1956, to August 1, 1957. It has repeatedly been held that a jury cannot by its verdict find simultaneously that a contract has been fully performed according to its terms and allow damages for its breach. Johnson v. Estate of Girvin, Mo.App., 370 S.W.2d 163, 167 [1]; Shaw v. Richards, 208 Mo.App. 671, 676–677, 236 S.W. 405, 406–407; Ferd Bauer Engineering & Contracting Co. v. Arctic Ice & Storage Co., 186 Mo.App. 664, 669–671, 172 S.W. 417, 419; Barr & Martin v. Johnson, 170 Mo.App. 394, 398–399, 155

S.W. 459, 460; Ruth v. McPherson, 150 Mo.App. 694, 701–702, 131 S.W. 474, 475–476. Manifestly, the jury could not have found for the plaintiff in the full amount of its claim—with accrued interest—and still have found that part of the feed was moldy and impure; and unless at least part of the feed was defective, no breach of warranty was established. Outcault Advertising Co. v. Schierbaum, Mo.App., 209 S.W. 982, 985 [3–5]. The verdict is inherently inconsistent in this case and, in our view, the findings are self-destructive.

■ This being true, it remains to be decided whether we should consider this matter as plain error. The rule allowing us to consider matters which were not raised, or were defectively raised, in the trial court, Rule 79.04, V.A.M.R., is stated as a rule of discretion to be applied when the court deems that manifest injustice or a miscarriage of justice has resulted from the commission of such plain error. We believe the inconsistency of the jury's verdict should be considered as plain error in this case. We note, without specifically placing our decision on this ground, that there is recent authority to the effect that a judgment based on a verdict which is insufficient to sustain it is wholly invalid. Thorne v. Thorne, Mo., 350 S.W.2d 754, 757. We do not undertake, however, to consider the import of that decision as it applies here. We are convinced that in this case the inconsistency of the verdict has deprived the parties of a clear and precise determination of substantial rights and that a manifest injustice has resulted.

■ We are not, however, inclined to follow the plaintiff's suggestion that the case be remanded for a new trial solely upon the counterclaim. It is true that the defendants have not appealed, but when it is essential to do justice, or when a retrial of the issues necessarily affects non-appealing parties, we may remand a case for retrial even as to the non-appealing parties. Hardwick v. Kansas City Gas Co., 355 Mo.

100, 104–105, 195 S.W.2d 504, 506; Rule 83.13(c), V.A.M.R.

The judgment is therefore reversed and the cause remanded for a new trial on both the claim and counterclaim.

RUARK, P. J., and STONE, J., concur.